SAVOY VENDING COMPANY, INC., Plaintiff, *v.* LEWIS J. VALENTINE, as Police Commissioner of the City of New York, Defendant.

Supreme Court, Special Term, New York County, February 11, 1942.

*Leonard M. Wallstein*, for the plaintiff.

*William C. Chanler, Corporation Counsel* [*Charles C. Weinstein, Harry Hollander* and *Bernard Friedlander* of counsel], for the defendant.

LEVY, J. Plaintiff claims to be a jobber and distributor of coin-operated equipment, including pin-ball games. The latter have been so widely distributed and operated in public and private places of assembly that familiarity with their general appearance

and manner of play may well be assumed. A large quantity of such contrivances has been seized by the police department of the city of New York, by order of the defendant, the police commissioner. Many of them were seized while in possession of the plaintiff. The latter claims that none of these, when seized, was in operation or offered for use or operation; that none was structurally capable of use as a gambling device; that they merely furnished amusement.

Those engaged in plaintiff's enterprise have insisted upon the respectability of its sponsors and the innocence of the machines and sport which they purvey. Possession alone of such mechanisms, it is declared, is not a crime, and, therefore, justifies no police action. Accordingly, plaintiff seeks to restrain defendant from interfering with it and its property, or from issuing any notice of violation of section 973 of the Penal Law.

There has been recent intensified action by the police department in its vigilance to safeguard public morals, particularly of children, against the hazards and depredations of gambling devices offered by racketeering organizations with unsavory backgrounds. For their own venal aggrandizement they spread their tentacles indiscriminately among the people of this city, despite the certain knowledge that the lure and incitements of their vicious contraptions will result in increased petty crime, juvenile delinquency, and even more serious crimes. It is charged that this activity followed immediately upon a judgment of conviction in a case tried before a magistrate who held that mere possession of machines of the type seized from plaintiff is a violation of section 982 of the Penal Law. The characteristic features of these machines are: a device which flashes winning scores as distinguished from progressive scores; another which cumulatively records all winning scores, and a construction which permits manipulation so as easily and readily to change the number of points necessary for a winning score. Such a mechanism comes clearly within section 982 of the Penal Law. (*People* v. *Jennings*, 257 N. Y. 196.)

The police commissioner, it is claimed, is in agreement with the holding of the magistrate that possession of the described contraptions is a violation of section 982. (*People* v. *Fitzgibbons*, N. Y. L. J. Jan. 22, 1942, p. 320.) The present attempt to restrain the defendant tends, therefore, to interfere with the law enforcement authorities in the prosecution of cases arising under sections 973 and 982. (*Reed* v. *Littleton*, 275 N. Y. 150.)

Equipment of the kind here involved is in appearance quite innocent to the uninitiate and the gullible, unaware of the conniving malefactions that lurk behind it. There are many other

instruments, indeed, beneficial in conception, productive of social and industrial good and betterment, which come to mind, equally capable with the coin-operated machines of evil uses. Thus the cobbler and his awl serve the obvious purpose of maintaining footwear in repair; the crowbar is a useful instrument in the hands of the road builder; lead pipe plays its part in sanitation, while the product of the sculptor's chisel enriches life. Present these assembled implements to the ordinary and proper person and no untoward result will ensue. Place them in the hands of the marauder, who by night stealthily invades our privacy, and at once they become the tools of the burglar. There is, therefore, presented the question whether the articles taken from plaintiff's premises actually enjoy the innocence claimed for them.

For years the judicial, law enforcement, educational and social service agencies have studied and investigated the operations and evil influences of the coin-operated machines. This research has been instigated apparently by urgent need, and inspired by the earnest desire to rid the city of a primary cause in the increase of crime and juvenile delinquency. In the course of this humane undertaking the sponsors of this malevolence have by changing stratagems sought to evade the effect of successive convictions in the prosecution of cases of gambling law violations, and the latest product of that destructive genius is the present pin-ball machine in its manifold forms. Data bearing upon this problem in its historical aspect and harmful incidence, together with findings and observations thus far made, have been collated by the corporation counsel on behalf of the defendant and presented to the court for its guidance in the answering affidavits, whose bulk is surpassed only by the quality of the presentation. A difficult task has been accomplished in the short time permitted in a fashion so masterly that it deservedly evokes the commendation of this court. To locate a more completely overwhelming and comprehensive answer to a petition of this character would indeed be exceedingly difficult, if not well-nigh impossible.

In the forefront of an impressive parade of witnesses comes the mayor of the city, whose constant energy has implemented his desire to drive every type of gambling machine out of the city, convinced that the pin-ball industry has always been operated largely by criminals and underworld characters, with resultant pernicious influence upon the public and even more destructive effect upon the morals of children. Plaintiff's direct participation in this enterprise under the well-known and illegal pay-off system is demonstrated. If this be true, its use, possibly, as a respectable front cannot save the plaintiff from the consequence of acts thus

outlawed. Supporting the mayor, as the papers here disclose, are the defendant, the police commissioner, the commissioner of investigation, the Assistant Attorney-General in charge of the Kings county investigation, a justice of the Domestic Relations Court, the executive director of the Society for the Prevention of Crime, high school and public school principals, an agent for the Queens Society for the Prevention of Cruelty to Children, and in addition the respective district attorneys within the city of New York. In passing it may be interesting to note what the district attorney for the county of Bronx — whose abiding concern for the social welfare in these matters is so well and widely recognized that it is almost a proper subject for judicial notice — took occasion to state in open court, following a conviction in a criminal prosecution: " I am unalterably opposed to the slot machine. I wouldn't let them run in this county no matter where they got their licenses * * *. What Judge HACKENBURG has said about murder possibilities is, in no sense, an exaggeration. I have had them kill and burn in this county time and time again. These men have been in other rackets. There is no slot machine on the market that can operate on the money it takes in for the amusement it offers. There is none that can survive unless there is gambling, the giving of a prize."

It is needless to burden this writing with a complete resumé of what the answering affidavits contain. Two fundamental points, however, have been made patently and painfully clear: *First*, the sponsors of coin-operated machines, invariably, have not aimed to respect the law, but rather to evade it, and, *second*, the effects upon youth have been evil. A few references will suffice. The industry stimulates the gambling instinct among young people and children of school age. Machines located in neighborhood candy and stationery stores, ice-cream parlors and similar establishments attract patronage to these places, which become " hang-outs " for children of all ages. Many of the devices are in locations within a block of public and parochial schools and are operated by pennies as well as nickels. It is hardly likely that the child who has no lack of opportunities for play and clean amusement is drawn from his healthy associations to squander lunch money and often hard-earned spending money upon the play of coin-operated machines for mere amusement. It is the lure and enticement of a hoped-for but never realized easy gain. And there we have the beginning of a hold upon fancy and imagination that increases its demand, nurtured by unsavory associates, until; too late, the path of petty crime, juvenile delinquency and hardened criminality has claimed another victim. Almost without exception each affian*

has urged opposition to this application in the interest of child welfare.

Furthermore, it is established that the contrivances here in dispute are mechanically arranged to offer free games or free play, or are convertible so as to perform in that manner, and may be very easily manipulated to reduce the chance of obtaining a winning score. They are provided with registers to inform the plaintiff and others of the amount of winning scores paid off by the location proprietor. It is estimated that the annual " take " in New York city exceeds $20,000,000, while the " pay-off " is but a fraction. Moreover, it is found the industry contributes directly to the incidence of criminality other than gambling, and provides the means of financing other types of crime. An instance is told of a high school student and member of an under-privileged family who was employed on Saturdays in order to aid his family in getting him through high school. He was shown to have dissipated all his earnings on four successive Saturdays upon a machine operated in a candy store near the place of his employment. It is also shown that in a number of cases the machines get all their play from school children, during lunch hour and after three in the afternoon. This gambling frequently leads to lying and stealing. Little wonder that whereas youths of sixteen, seventeen and eighteen years comprise only five per cent of the city population, they are said to commit more than thirty per cent of the city's burglaries.

The court is of the opinion that more than sufficient has here been shown to demonstrate the utter lack of proof that the machines taken from plaintiff are not within the purview of section 982 of the Penal Law. Doubt, within reason, should halt the hand of the defendant. But there is no such doubt. Judicial discretion, within reason, must permit the defendant to continue in the performance of a proper public duty. (*Mills Novelty Co.* v. *Sunderman*, 266 N. Y. 32; *Triangle Mint Corp.* v. *Mulrooney*, 257 id. 200.) The motion must be denied.